#26956-a-SLZ

**2014 S.D. 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

NATIONWIDE MUTUAL
INSURANCE COMPANY,                              Plaintiff and Appellant,

v.

BARTON SOLVENTS, INC. and
CITGO PETROLEUM CORPORATION,                    Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
LAKE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE TIM D. TUCKER
Judge

* * * *

MITCHELL A. PETERSON
JUSTIN T. CLARKE of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota          Attorneys for plaintiff
                                   and appellant.


MICHAEL F. TOBIN
GARY J. PASHBY of
Boyce, Greenfield, Pashby & Welk, LLP
Sioux Falls, South Dakota          Attorneys for defendant and
                                   appellee Barton Solvents, Inc.

* * * *

                                   ARGUED ON
                                   AUGUST 26, 2014

                                   OPINION FILED **10/01/14**

WILLIAM C. GARRY of
Cadwell, Sanford, Deibert & Garry, LLP
Sioux Falls, South Dakota

    and

WILLIAM S. BOOTH of
Eimer, Stahl, Klevorn & Solberg, LLP
Chicago, Illinois

Attorneys for defendant and
appellee Citgo Petroleum
Corporation.

#26956

ZINTER, Justice

[¶1.]        A.H. Meyer & Sons, Inc. (A.H. Meyer) owned and operated a honey and

beeswax processing plant that exploded.  The explosion was caused by heptane

vapors that were ignited by an electrical switch in the plant.  Nationwide Mutual

Insurance (Nationwide) paid for the damage and filed suit seeking subrogation from

the supplier and the manufacturer of the heptane.  Nationwide pleaded causes of

action for strict liability and negligence premised on the theory that the defendants

failed to adequately warn of heptane's dangers.  Nationwide also pleaded causes of

action for breach of express and implied warranties.  The circuit court granted the

defendants' motion for summary judgment.  We affirm.

*Facts and Procedural History*

[¶2.]        A.H. Meyer produced honey and beeswax at its plant in Winfred, South

Dakota.  A.H. Meyer was owned by Jack Meyer, Jr. (Jack) and J.B. Meyer (J.B.).

J.B. took over operations from his grandfather, Jack Meyer, Sr.  Barton Solvents,

Inc. (Barton Solvents) marketed, sold, and distributed heptane, a highly volatile

and combustible solvent manufactured by CITGO Petroleum Corporation (CITGO).

A.H. Meyer used heptane in its beeswax rendering process.  Barton Solvents sold

heptane to A.H. Meyer for over twenty years and had observed A.H. Meyer's plant

on at least one occasion.

[¶3.]        Barton Solvents delivered the heptane to a 10,000 gallon tank located

outside the plant.  The heptane was then pumped and stored in a "kettle," a 150-

gallon storage tank, inside the plant.  Because liquid heptane would occasionally

spill from the top of the kettle and vaporize, A.H. Meyer installed a ventilation system in an attempt remove the heptane vapors from the plant.

[¶4.]     Barton Solvents provided A.H. Meyer with CITGO's Material Safety Data Sheet (MSDS) with each delivery.[1]  The MSDS was a ten-page document that described the volatile nature of heptane, listed its potential hazards, and provided other warnings.  The MSDS specifically warned that heptane liquid and vapor were "extremely flammable" and "may cause flash fire[s]."  Right beneath that warning, the MSDS warned that the "[v]apor may travel considerable distance to source of ignition and flash back."  The MSDS therefore recommended that heptane be used only with "adequate" ventilation.  The MSDS also warned that "[a]ll electric equipment should comply with the National Electrical Code."  The National Electrical Code (NEC) referenced many recommended practices of the National Fire Protection Association (NFPA).  NFPA 497 contained recommended practices for flammable liquids, gases or vapors, as well as the location and selection of electrical installations in chemical process areas.  By illustration, NFPA 497 recommended a five-foot distance between heptane and ignition sources such as standard (non-explosive proof) electrical switches.  The recommended practices were to be applied with "sound engineering judgment."

[¶5.]     A.H. Meyer suffered two heptane explosions at its plant.  The first explosion occurred in 2004.  It was caused when a standard electrical switch,

---

1.     Barton Solvents also provided warning labels that Jack personally affixed to the 10,000 gallon tank.

located four feet from heptane, ignited heptane vapors.[2] Jack Meyer, Sr. designed a new plant following the 2004 explosion. A.H. Meyer contacted Premier Engineering, Inc., an electrical and mechanical engineering company, for consultation as to what electrical changes needed to be made to the new facility to avoid another explosion. Premier Engineering told A.H. Meyer that standard electrical switches should not be within five feet of heptane. A.H. Meyer also consulted with the State Fire Marshall regarding risks of fire and explosion.

[¶6.] In the new plant, standard switches were installed a minimum of five feet from the kettle and five feet above the floor (because heptane vapor is heavier than air causing it to sink to the floor). Following reconstruction in 2006, a South Dakota State Electrical Inspector conducted a final inspection of the building. He indicated the building "was in compliance with South Dakota Laws and Rules and the National Electric Code."

[¶7.] The explosion at issue occurred in 2009 when heptane spilled from the kettle and an A.H. Meyer employee pressed a standard switch to turn off a pump. Duane Wolf, a mechanical engineer, was retained as Nationwide's expert witness in this litigation. He concluded through experimental tests that the ventilation system A.H. Meyer installed possibly had the opposite effect that was intended: it stirred up heptane vapors and moved them more than five feet to a point where they were ignited by the standard electrical switch.

---

2.      As early as 1986, A.H. Meyer was aware that heptane vapors could be ignited by standard electrical switches.

[¶8.]     Nationwide filed suit against Barton Solvents and CITGO on causes of action alleging strict liability, negligence, breach of express warranty, breach of implied warranty of fitness for a particular purpose, and breach of implied warranty of merchantability.  All theories were directly or indirectly based on the contention that Barton Solvents and CITGO provided inadequate warnings of the dangers of the use of heptane.

[¶9.]     Barton Solvents and CITGO moved for summary judgment.  They argued that A.H. Meyer failed to meet its summary judgment burden of identifying specific facts showing inadequacy of the warnings.  The circuit court agreed with the defendants and granted summary judgment.  On appeal, Nationwide contends that summary judgment was inappropriate because material issues of disputed fact existed with respect to the adequacy of the warnings.

*Decision*

[¶10.]     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  SDCL 15-6-56(c).  "We view all reasonable inferences drawn from the facts in the light most favorable to the non-moving party."  *Luther v. City of Winner*, 2004 S.D. 1, ¶ 6, 674 N.W.2d 339, 343 (quoting *Roden v. Gen. Cas. Co. of Wis.*, 2003 S.D. 130, ¶ 5, 671 N.W.2d 622, 624).  "The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists."  *Hass v. Wentzlaff*, 2012 S.D. 50, ¶ 11, 816 N.W.2d 96, 101 (quoting *Saathoff v. Kuhlman*, 2009 S.D. 17, ¶ 11, 763 N.W.2d 800, 804).

Therefore, "[e]ntry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *W. Consol. Coop. v. Pew*, 2011 S.D. 9, ¶ 19, 795 N.W.2d 390, 396). A sufficient showing requires that "[t]he party challenging summary judgment . . . substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Quinn v. Farmers Ins. Exch.*, 2014 S.D. 14, ¶ 20, 844 N.W.2d 619, 624-25 (quoting *Stern Oil Co. v. Brown*, 2012 S.D. 56, ¶ 8, 817 N.W.2d 395, 398).

*Products Liability*

[¶11.] Nationwide argues that the defendants were negligent and strictly liable because they failed to give adequate warnings of the dangers posed by A.H. Meyer's use of heptane. Nationwide contends that the warnings were inadequate because Barton Solvents knew of A.H. Meyer's use of heptane, A.H. Meyer complied with the NFPA 497 five-foot spacing electrical equipment recommendation, but the explosion still occurred. Nationwide contends that a disputed question of material fact exists regarding the adequacy of the warning.

[¶12.] Barton Solvents and CITGO concede that the explosion occurred even though A.H. Meyer complied with the five-foot spacing recommendation. However, they contend that Nationwide failed to identify expert testimony or any evidence indicating the MSDS, NEC, and NFPA 497 warnings were inadequate. They further contend that even though the electrical switch met the five-foot spacing recommendation, the mere fact of an accident is insufficient to prove negligence or strict liability.

[¶13.] Negligence in products liability actions involving inadequate warnings requires a plaintiff to "show that the manufacturer or seller failed to exercise reasonable care to inform those expected to use the product of its condition or of the facts which make it likely to be dangerous." *Jahnig v. Coisman*, 283 N.W.2d 557, 560 (S.D. 1979) (citing Restatement (Second) of Torts § 388 (1965); *Dougherty v. Hooker Chem. Corp.*, 540 F.2d 174, 177 (3rd Cir. 1976)). "Strict liability arises when a manufacturer 'sells any product in a defective condition unreasonably dangerous to the user or consumer.'" *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 32, 737 N.W.2d 397, 408 (quoting *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 912 (S.D. 1987)). A "manufacturer's failure to adequately warn render[s] the product unreasonably dangerous without regard to the reasonableness of the failure to warn judged by negligence standards." *Id.* ¶ 35, 737 N.W.2d at 409 (quoting *Peterson*, 400 N.W.2d at 912). The product does not need to be defective itself. *Id.* (quoting *Jahnig*, 283 N.W.2d at 560). "Where a manufacturer or seller has reason to anticipate that danger may result from a particular use of [the] product, and . . . fails to give adequate warning of such a danger, the product sold without such warning is in a defective condition within the strict liability doctrine." *Id.* (alteration in original) (quoting *Jahnig*, 283 N.W.2d at 560).

[¶14.] Here, Barton Solvents warned A.H. Meyer of the danger associated with heptane. The MSDS, NEC, and NFPA 497 collectively warned that heptane was volatile and explosive. They explained the mechanism and mode of potential injury. The warnings indicated that heptane vapor could travel a "considerable distance," and the warnings related the danger of standard electrical switches

located near heptane vapors even in a ventilated room. Finally, the warnings provided recommendations on ways to safely use the product. The warnings referenced the five-foot spacing recommendation of the NEC and NFPA 497.

[¶15.] Nationwide argues that those warnings were inadequate because A.H. Meyer complied with the five-foot spacing recommendation but the explosion still occurred. Nationwide points out its expert established that the accident was caused by an electrical switch that was five feet from the kettle. Nationwide's expert opined that the ventilation system exacerbated vapors from the spilled heptane and moved the vapors beyond a five-foot radius. Nationwide contends that once the scientific validity of this theory of causation was established by its expert in testing, "no further expert testimony [or evidence was] required" to resist summary judgment. We disagree

[¶16.] In many cases, "the fact that an accident occurred" is insufficient in and of itself to meet the summary judgment burden of identifying specific facts to support the elements of a plaintiff's product liability claim. *See id.* ¶ 38, 737 N.W.2d at 410. "[T]hose resisting summary judgment must show that they will be able to place sufficient evidence in the record at trial to support findings *on all the elements* on which they have the burden of proof." *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 18, 652 N.W.2d 756, 765 (emphasis added) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)).

[¶17.] In a products liability case premised on alleged inadequate warnings, both causation and inadequate warnings are separate but necessary elements of

negligence and strict liability. They are also elements on which Nationwide bore the burden of proof at trial. Therefore, to successfully resist summary judgment, Nationwide was required to provide "an evidentiary basis" for both elements. *See Burley*, 2007 S.D. 82, ¶ 32, 737 N.W.2d at 409. Furthermore, product liability often "involves technical issues which do not easily admit to evidentiary proof and which lie beyond the comprehension of most jurors." *Id.* ¶ 28, 737 N.W.2d at 407 (quoting *Peterson*, 400 N.W.2d at 913). Therefore, in attempting to establish the elements of products liability, "unless it is patently obvious that the accident would not have happened in the absence of a defect, a plaintiff cannot rely merely on the fact that an accident occurred." *Id.* Expert testimony is generally necessary to establish elements of negligence and strict liability. *Id.* ¶¶ 28-39, 737 N.W.2d at 407-11.

[¶18.] This is not one of those cases in which it is patently obvious that the accident would not have happened but for an inadequate warning. Nationwide's claims are based on the assumption that the warning must have been inadequate because the five-foot spacing recommendation was followed yet the explosion occurred. But Nationwide's theory is also based on the expert opinion that the ventilation system A.H. Meyer designed and installed had the opposite effect as intended as it was a contributing cause of the explosion.[3] Moreover, Nationwide

---

3. Nationwide's inadequate warning claim is based on the assumption that the five-foot spacing recommendation was inadequate *because* the ventilation system exacerbated and moved the vapors more than five feet. Therefore, we reject Nationwide's argument that the ventilation system is not relevant in determining whether the product was defective (inadequate warnings). Nationwide made the ventilation system relevant by basing its theory of liability on the opinion that the ventilation system made the five-foot spacing recommendation inadequate.

identified no evidence or expert testimony indicating that the MSDS, NEC, and NFPA 497 warnings were inadequate; that the defendants breached any standard of care; or that the defendants did anything wrong.[4] Therefore, although Nationwide established a scientific possibility for the cause of the explosion, that evidence did not establish an evidentiary basis that the MSDS, NEC, and NFPA 497 warnings were inadequate.

[¶19.] Ultimately, Nationwide's inadequate warning claim is based on nothing more than the fact of the accident, speculation, and conjecture. Such a showing is insufficient to resist summary judgment. *See Quinn*, 2014 S.D. 14, ¶ 20, 844 N.W.2d at 624-25 ("[T]he party challenging summary judgment must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." (quoting *Stern Oil Co.*, 2012 S.D. 56, ¶ 8, 817 N.W.2d at 398)).

[¶20.] Nationwide, however, also points out that Barton Solvents knew that A.H. Meyer used a ventilation system, which their expert indicated was a factor contributing to the explosion. Nationwide further points out that Barton Solvents's representatives toured the plant, knew the heptane was used for industrial purposes, industrial facilities typically have ventilation, and heptane vapors would respond to the air currents generated by a ventilation system. Nationwide argues that the defendants failed to adequately warn that because of A.H. Meyer's ventilation system, heptane vapors could travel more than five feet.

---

4.      Nationwide admitted at the summary judgment hearing and at oral
        argument it did not have experts or other persons who would say that the
        warning should have been different.

[¶21.]     The MSDS, however, expressly warned that heptane vapors could travel long distances. Bold lettering on the front of the MSDS warned that "[v]apor may travel considerable distance to source of ignition and flash back." The third page of the MSDS warned that vapor "may travel long distances along the ground to an ignition source and flash back." Thus, although the MSDS and NEC incorporated the NFPA illustration showing five feet of separation, A.H. Meyer was also warned that the distance could be greater; i.e. that heptane vapors could travel considerable and long distances. Moreover, the MSDS specifically warned that heptane was to be used only with "adequate" ventilation, and NFPA 497 warned that use of its five-foot illustration should be used with "sound engineering judgment." Finally, as the circuit court correctly noted, Nationwide provided no facts indicating that the Barton employees observed anything specific about the ventilation system during their tour of the facility. There was no evidence the employees saw the ventilation system A.H. Meyer designed, saw any particular risks of a heptane explosion in the plant, or were asked to look for such risks.

[¶22.]     The summary judgment evidence indicated that the warnings provided to A.H. Meyer were the NEC and NFPA standards. Further, although Nationwide established an affirmative evidentiary basis for proceeding to trial on the question of causation, it did not produce an expert or identify specific, affirmative evidence indicating that the MSDS, NEC, and NFPA warnings were inadequate. We conclude that the circuit court did not err in granting summary judgment on strict liability and negligence because Nationwide could not meet its summary judgment burden of producing evidence that the warnings provided were inadequate.

*Express Warranty*

[¶23.] SDCL 57A-2-313(b) provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Nationwide points out that the heptane invoices informed the purchaser to read the MSDS. The MSDS warned buyers that: "[a]ll electrical equipment should comply with the National Electric Code"; the NEC refered to NFPA 497; and NFPA 497 illustrated the five-foot spacing between heptane and standard electrical switches. Therefore, Nationwide argues that the five-foot requirement became the equivalent of an instruction manual or description of the goods. Nationwide further argues that because there was an explosion, the heptane did not conform to that description. *See James River Equip. Co. v. Beadle Cnty. Equip., Inc.*, 2002 S.D. 61, ¶ 21, 646 N.W.2d 265, 269 (stating that purchase agreements "may incorporate by reference another document containing technical specifications for the product, and this will likely create an express warranty by description.") (citations omitted).

[¶24.] We first observe that Nationwide does not contend that the heptane was defective, contaminated, or otherwise anything other than the heptane A.H. Meyer contracted to receive. Further, the MSDS, NEC, and NFPA 497 did not expressly warrant the heptane. Those documents warned of the danger associated with heptane's use. A warning is the "pointing out of danger." *Black's Law Dictionary* (9th ed. 2009). In contrast, a warranty is "[a] promise that the thing being sold is as represented[.]" *Id.* One is an alert, the other a promise. Although we agree with Nationwide that a warning could constitute a warranty in some

cases, NFPA 497 was a recommendation to be used with sound engineering judgment. It was not an incorrect, affirmative promise.

[¶25.] Nationwide's reliance on *James River Equipment Co.* is misplaced. *James River Equipment Co.* involved an affirmative representation of the number of hours certain equipment had been used. 2002 S.D. 61, ¶ 4, 646 N.W.2d at 267. Because the number of hours represented was inaccurate, this Court found a breach of express warranty. *Id.* ¶ 31, 646 N.W.2d at 271. But here, as previously noted, the warnings did not affirmatively represent that heptane vapors would not explode if placed five feet from non-explosion proof switches. NFPA 497 expressly stated that its purpose was to provide the user with a basic understanding of parameters to determine the location of hazardous liquids, assist in the selection of electrical equipment, and to be used as a guide to be applied with sound engineering judgment. Because NFPA 497 did not provide affirmative representations or instructions indicating heptane would not explode if its recommendations were followed,[5] *James River Equipment Co.* is inapposite. There is no evidence that these defendants made untrue representations of fact regarding heptane.[6]

[¶26.] Nationwide, however, also points out that NFPA 497 contained illustrations of the five-foot spacing between heptane and electrical equipment.

---

5. Nationwide's reliance on other language in the NFPA is misplaced. Nationwide overlooks the language that the NFPA contains recommended practices to be used as a guide with sound engineering judgment.

6. Nationwide's reliance on *Weinstat v. Dentsply Int'l, Inc.*, 103 Cal. Rptr. 3d 614 (Cal. Ct. App. 2010) is misplaced for the same reason. In that case, the products "Directions for Use" incorrectly stated it could be used for oral surgery. *Id.* at 620.

Nationwide argues those illustrations constituted instructions providing an express warranty. *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 279 (4th Cir. 2007) (concluding a jury could find that illustrations and instructions regarding the installation of airplane cables constituted an express warranty).

[¶27.]     Nationwide's reliance on *Colgan Air* is misplaced.  In *Colgan Air* an airplane maintenance manual stated that "[p]roper winding of the cables on the pedestal and actuator drums, is shown in . . . the *Elevator Tab Control Cables Winding illustration in Chapter 27-30-04* for elevator tabs, *ensures* against crossing the cables causing improper trim tab movement."  *Id.* at 279 (second emphasis added).  Here, the language and illustration in NFPA 497 did not use the word "ensure" or other similar language affirmatively representing that explosions would not occur if the illustration was followed.  Nationwide failed to identify evidence suggesting that the defendants' warnings were an affirmative description, instruction, or illustration that constituted an express warranty of heptane that was untrue.

*Implied Warranty of Fitness for a Particular Purpose*

[¶28.]     Nationwide suggests that because of the parties' lengthy history, Barton Solvents knew A.H. Meyer's purpose for using heptane.  Nationwide contends that the defendants had reason to know their buyers would rely upon the defendants' expertise, skill, and knowledge in furnishing suitable goods.  Nationwide argues that the heptane was not fit for A.H. Meyer's particular purpose because the heptane vapors drifted and caused an explosion.

[¶29.] "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." SDCL 57A-2-315. "When an implied warranty of fitness for purpose is created, the seller must deliver a product that is fit for the purpose for which it is intended." *Virchow v. Univ. Homes, Inc.*, 2005 S.D. 78, ¶ 21, 699 N.W.2d 499, 505. "A perfect product is not required." *Id.* (citing *Waggoner v. Midwestern Dev., Inc.*, 83 S.D. 57, 68, 154 N.W.2d 803, 809 (1967)). "The person asserting a violation of the warranty of fitness for a particular purpose must present sufficient evidence, direct or circumstantial, to permit the inference that the product was defective when it left the manufacturer's possession or control." *Id.* ¶ 21, 699 N.W.2d at 506 (citing *Schmaltz v. Nissen,* 431 N.W.2d 657, 663 (S.D. 1988); *Pearson v. Franklin Labs., Inc.*, 254 N.W.2d 133 (S.D. 1997)).

[¶30.] In this case, Nationwide does not argue that the heptane was defective or unfit for rendering beeswax when the heptane left Barton Solvent's possession.[7] The fact that A.H. Meyer's ventilation system possibly moved the heptane vapors more than five feet away from the heptane source did not mean the heptane was not

---

7. Nationwide does argue that the heptane was defective because it contends that the defendants failed to warn of a foreseeable danger. All authority cited for this argument is premised on inadequate warnings. Here, we have already decided Nationwide failed to identify sufficient affirmative evidence indicating that the warning was inadequate. Nationwide's authorities are also distinguishable because in those cases: (1) there was no warning; (2) there was evidence indicating the warnings were inadequate; or (3) the product was physically defective for the actual purpose intended.

fit for rendering beeswax. Nationwide failed to identify evidence suggesting the heptane was not fit for rendering beeswax.[8]

*Implied Warranty of Merchantability*

[¶31.]     Under SDCL 57A-2-314, if goods are sold by "a merchant with respect to goods of that kind," there is an implied contract those goods are merchantable. SDCL 57A-2-314(1). Merchantable goods are those that, among other things . . . :

> (c) Are fit for the ordinary purposes for which such goods are used; and . . .
> (e) Are adequately contained, packaged, and labeled as the agreement may require; and
> (f) Conform to the promises or affirmations of fact made on the container or label if any.

SDCL 57A-2-314(2).

[¶32.]     Nationwide argues that the heptane was not fit for its ordinary purpose under SDCL 57A-2-314(2)(c) because it caused an explosion. Nationwide contends that this case is similar to *Crandell v. Larkin & Jones Appliance Co.,* 334 N.W.2d 31, 36 (S.D. 1983) (concluding that by starting a fire, the dryer was not fit for the purpose for which it was purchased).

[¶33.]     *Crandell* is inapposite. In that case, a used clothes dryer was sold with a guarantee for workmanship, parts, and labor. *Id.* at 32. Fourteen days after the sale, the dryer overheated causing a fire and damage to plaintiff's home. *Id.* The fire was caused by defective thermostats in the dryer. *Id.* at 34. But in this case,

---

8.     Nationwide also argues that the defect stems from the adequacy of the warning and product use instructions. But as we have previously explained, Nationwide failed to identify sufficient evidence to support this theory.

unlike *Crandell*, there was no defect in the heptane itself and there was no affirmative guarantee of the product.[9]

[¶34.]     Nationwide argues that the heptane was not merchantable under SDCL 57A-2-314(2)(e) because it contends the heptane was inadequately labeled. But this is the same argument we have rejected under Nationwide's other claims. For the reasons previously discussed, this argument is without merit.

[¶35.]     Finally, Nationwide argues that the heptane was not merchantable under SDCL 57A-2-314(2)(f). Nationwide contends that the heptane did not conform to the promises or affirmations made by the defendants. Because Nationwide agrees that this argument is premised on the same contentions we rejected under express warranty, we affirm on this claim without further discussion.

[¶36.]     We affirm the circuit court's grant of summary judgment.

[¶37.]     GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.

---

9.     Nationwide's other authority is also distinguishable. The cases cited either (1) determined the warning was inadequate and the damage was foreseeable, (2) only recognized the potential of a claim for implied warranty of merchantability, or (3) affirmed summary judgment in favor of defendants on the issue of causation.